## UNITED STATES v. COURTRIGHT-DIMMICK CO. et al.

District Court, E. D. Pennsylvania. May 9, 1928.

No. 69.

P. W. Knox, of Philadelphia, Pa., H. F. Birnbaum, of New York City, M. H. Avery, of Washington, D. C., and George W. Coles, U. S. Atty., of Philadelphia, Pa., for plaintiff.

C. W. Van Artsdalen, of Philadelphia, Pa., for respondent.

KIRKPATRICK, District Judge. This is a libel by the United States, as owner of the steamship Chester Kiwanis, against the respondent, charterer of the vessel, to recover demurrage for an alleged delay in loading cargo.

The respondent first raises the question of law that the United States is not the proper party to bring the suit. The charter party purports to be made by "Black Diamond Steamship Corporation, as agents for United States Shipping Board, owners or chartered owners," etc., and is signed "The United States Shipping Board, Black Diamond Steamship Corporation, by F. E. Huck, as Agents." The agreements between the government and the Black Diamond Steamship Corporation for managing and operating the vessel in question are in evidence. They purport to be made by "the United States of America, acting through the United States Shipping Board, represented by United States Shipping Board Emergency Fleet Corporation." These agreements appoint the Black Diamond Steamship Corporation agent for the Fleet Corporation to manage and operate vessels assigned to it, and complete the chain of agency.

It seems unnecessary to enter into a discussion of the character of the Fleet Corporation as a separate entity, distinct from any department or branch of the government. It can hardly be disputed that, whatever its status, it is under the evidence in this case the duly authorized agent of the United States. "That the United States can sue in its own name on contracts made by any duly authorized officer or agent, acting in its name, or for it and in its behalf, has never been questioned." U. S. v. Russell Wheel & Foundry Co. (D. C.) 11 F.(2d) 531. See Dugan v. U. S., 3 Wheat. (16 U. S.) 172, 4 L. Ed. 362. The suit is, therefore, properly brought in the name of the United States.

The respondent's second defense raises a question of fact. It is contended that the vessel was not in readiness to load at the time notice was given, nor in fact at any time prior to the actual completion of the loading. It is conceded by the respondent that the vessel arrived in Philadelphia on July 23, 1920, and was accepted by the respondent as of 11 a. m., July 26, at which hour the 96 hours' free time, provided by the charter party (paragraph 4), began, expiring at 11 a. m. Friday, July 30. It is also agreed that the ship loaded 6,480 tons of coal, and, under the rate provided in the charter party of 1,500 tons per running day, Sundays and legal holidays excepted, the charterer was allowed 4 days, 7 hours, 41 minutes of lay time after the expiration of the free time. If the ship were in readiness, these facts would place her on demurrage as of 6:41 a. m. August 5. The trimming of the cargo was completed August 9 at 8 a. m., a period of approximately 4 days and 1 hour after the end of the allowed time under the charter party. It is also agreed that the daily rate of demurrage, as set forth in the libel, is correct, and it follows that, if the libelant is entitled to recover, without allowance by reason of bunkering and the trial trip, it should recover the amount claimed in the libel.

The respondent's contention that the ship was not in readiness rests upon several points, which will be considered separately:

(1) I find no evidence that a deep-loaded sea trial was a required preliminary to placing the Black Diamond Steamship Corporation in a position to tender the vessel to the charterer. It appears that the vessel passed into the custody of the Black Diamond Corporation under a tender by the Shipping Board dated July 21, 1920. This tender was stated to be preliminary to a tender for final acceptance, "which will be made to you as soon as vessel satisfactorily completes official trial trip requirements." It appears that prior to that time the vessel had had a dock trial of 6 hours and a light-loaded sea trial of about the same time, both of which showed her to be satisfactory. A deep-loaded sea trial was actually made after the cargo was taken on, but it does not ap-

pear definitely that she would not have proceeded without this trial. The evidence indicates a thoroughly seaworthy vessel. The recommendations made by the trial board, which accompanied her, were all for betterments of a minor character, and did not describe any defect which affected her readiness at any prior time. So far as the evidence shows, both parties seem to have dispensed with any further tender, and treated the acceptance by the Black Diamond Corporation as final. At any rate, as neither the government nor the Black Diamond Corporation has raised the question, the charterer is not in a position to do so.

(2) The respondent offered in evidence portions of the chief engineer port log, showing that repairs were being made upon the ship, not only by the crew, but by outside men, from July 27 to August 7, inclusive, and refers to the testimony of the chief engineer that, when a vessel is in port, the engine room department does all the minor repairs upon the machinery themselves. There is nothing, however, to show what the nature of the work was which was being done during this period, and, in view of the testimony as to her prior satisfactory engine performance, I cannot assume that this work was of such a nature that she could not have sailed without it, and find that there was nothing in her condition at any time prior to loading which affected her readiness.

(3) It is not denied by the libelant that the ship was not completely bunkered until August 10 at 2:55 a. m. Upon this point the respondent relies upon U. S. v. Gano-Moore Co., 28 F.(2d) 282, a case recently decided by Judge Knox in the Southern district of New York. That case, however, is entirely different, because it appears there that there was no fuel oil available, and that the vessel could not have been bunkered prior to the time that she actually was. It was, therefore, perfectly correct to hold that she was not "in every way fitted" for her contemplated voyage, as required by the charter. In this case, however, the testimony of Mr. Mulvey, who was assistant sales manager of the Atlantic Refining Company in the summer of 1920, at which time that company had a contract with the Shipping Board to supply fuel oil to its vessels, is to the effect that there was at all times, between July 23 and August 10, sufficient oil available for Shipping Board vessels to bunker the Chester Kiwanis. I therefore find as a fact that at the time of the tender the Chester Kiwanis was seaworthy and in all respects in readiness to make the voyage.

Decree for libelant, with costs, to be taxed by the clerk.